UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | 1:22-cr-00068-SE |
| v. | ) | |
| | ) | |
| KYLE MORRIS | ) | |

RESPONSE TO DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER

I. Introduction.

Defendant Kyle Morris was arrested on June 16, 2022, after being charged with the possession of two machineguns. After holding a detention hearing, the Magistrate Judge issued an order finding that "no condition or combination of conditions of release will reasonably assure the safety of any other person and the community." *Order of Detention Pending Trial*, ECF No. 10, at 2.

Morris now asks the Court to review the Magistrate Judge's detention order under 18 U.S.C. § 3145(b), which authorizes a defendant to move to revoke or amend a detention order with the court having original jurisdiction over the offense. Morris argues that his statements about starting a "race war" and attacking "Mosques, Synagogues, Diversity centers and businesses that hire non whites," are too old to demonstrate dangerousness. He also claims that the probation office wrongly characterized Morris as failing to inform the probation officer about various weapons in his home. In addition, Morris argues that his ties to New Hampshire and his honorable military service warrant release. *Motion for Revocation of Detention Order*, ECF No. 11, at 7-10.

This Court should reject Morris' arguments and find, like the Magistrate Judge, that the statutory factors weigh in favor of detention, including the defendant's history of use of weapons, "including electronic communications regarding efforts to sell fully automatic AK-47 to another individual," "evidence that following contact with FBI defendant smashed [a] cellphone" and disposed of it in the garbage, his "history and characteristics related to violent rhetoric," and the fact that he minimized his substance abuse history. *Order of Detention Pending Trial*, ECF No. 10, at 2-3.

II. <u>The bail reform act</u>.

A district court reviewing a magistrate judge's order detaining a defendant pretrial must "engage in de novo review of the contested order." *United States v. Tortora*, 922 F.2d 880 884 n. 4 (1st Cir. 1990). In reviewing a detention order, the district court "may reject the magistrate judge's fact finding and start the hearing anew or may accept the findings or fact made by the magistrate and hear additional facts and argument." *United States v. Cross*, 389 F. Supp. 3d 140, 142 (D. Mass. 2019); *United States v. Cantwell*, 2020 DNH 129, at 2 (July 2020), Barbadoro, J.

The Bail Reform Act authorizes the Court to detain a criminal defendant upon finding that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e); *see also* 18 U.S.C. § 3142(f)(1)(E) (authorizing the government to seek detention in a felony case that involves the possession or use of a firearm). In making its bail determination, the Court is required to consider information regarding: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any other person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The Government bears the burden of

demonstrating dangerousness by clear and convincing evidence and must support a finding of risk of flight by a preponderance of the evidence. *United States v. Johnson*, 12-mj-01-01-LM, 2012 WL 40463, at *2 (D.N.H. Jan. 6, 2012). The Government moved to detain the defendant only on dangerousness. The Government did not argue, and the Magistrate Judge did not find, that Morris is a flight risk. *Order of Detention Pending Trial*, ECF No. 10, at 2-3. Detaining the defendant is appropriate here because each of the factors set forth in 18 U.S.C. § 3142(g) weighs heavily in favor of detention pending trial and no condition or combination of conditions will reasonably assure the safety of the community.

   III. The nature and circumstance of the offense charged.

The indictment alleges that in February of 2022 the defendant possessed two machineguns, in violation of 18 U.S.C. § 922(o). The United States will proffer the following facts:

On February 16, 2022, FBI agents executed a search warrant at Morris's Salem, New Hampshire, home. During the search, agents found over 20 firearms in a locked closet on the second floor of the home. An ATF agent conducted a cursory review of two of those firearms—a 5.56x45mm Palmetto State Armory rifle, Model M4 Carbine, Serial Number W1020308, and 5.56x45mm Brownells Inc. rifle, Model BRN-16A1, Serial Number BRN7929—and, after a field test, believed the firearms were likely fully automatic. The rifles were sent to the FBI laboratory for further testing, where an expert determined that both functioned normally in both semi- and full-automatic modes. Therefore, under 18 U.S.C. § 922(o), both the weapons are machineguns.

The evidence also indicates that Morris possessed the machineguns and knew that they were machineguns. Morris is the owner and primary resident of the home where the

3

machineguns were found. Though Morris rents out rooms in the house, multiple witnesses told law enforcement that Morris stores his firearms in a locked closet in the home. A tenant informed law enforcement that only Morris had access to the locked closet. In addition, during a phone call with law enforcement on June 14, 2022, Morris confirmed that he is the only individual who had access to the locked closet where the machineguns were found. Indeed, Morris referred to it as "my gun room."

Other items in the closet also evidence Morris' access and control over that space. The closet contained approximately 25 of Morris' other firearms. It also contained Nazi paraphernalia, including items that had previously been shipped to Morris. In addition, it contained an FBI agent's business card that the agent personally handed to Morris months before.

Evidence from Morris' cellphone, obtained by law enforcement in June of 2021, indicates that Morris not only knew that the weapons recovered from the closet were machineguns, but also that he likely modified the firearms himself. Morris searched "full auto conversion," the process of converting a semi-automatic firearm to a fully automatic firearm. Additionally, Morris had AR-15 and AK-47 conversion manuals stored as bookmarks on his internet browser; both documents explain how to convert these firearms from semi-automatic to illegal fully automatic machineguns. In addition, the phone contained a conversation from July of 2020 where Morris, using his online pseudonym "Coil," discussed selling a fully automatic AK-47 to another individual:



Morris has made admissions about his use and possession of these firearms. During the February search of Morris' home, Morris told law enforcement that he had a drill press and that he used the drill press build his AR and M-16 upper.

IV. <u>The weight of the evidence against Morris is strong</u>.

The weight of the evidence is strong. The government's evidence will include the machineguns, Morris' own statements about his ownership and access to the area where the machineguns were found, and Morris' knowledge of firearms, including research on how to convert rifles into machineguns. Though Morris urges the Court to discount the weight of the evidence, it is a statutory factor for the Court to consider.

V. <u>Morris' history of discussing the commission of a racially motivated mass-shooting demonstrates his danger to the community</u>.

Morris' statements demonstrate his danger to the community and propensity for violence. Communications from Morris' cellphone show his disturbingly violent rhetoric and his status as an extremist white supremacist. Though early conversations recovered on the phone seem to disavow violence, Morris appears to have begun advocating for violence in July of 2020:



On July 31, 2020, Morris advocated for a violent takeover of a building in Massachusetts along with starting a "race war" and raising a swastika over a "symbolic building" in Massachusetts:



Morris spoke of attacking "Mosques, Synagogues, Diversity centers and businesses that hire non whites," and that he was willing to die in those attacks. Morris wanted "10 attacks across mass" culminating in a final attack, what Morris described as "one big one." Morris envisioned the final "big" attack to include someone driving a truck into the Massachusetts statehouse and blowing it up. In addition to these chats, Morris's internet search history includes searches of how to make explosives, consistent with his messages about his desire to "blow up" a building.

Morris claims that these statements do not weigh in favor of detention because they were made two years ago and because the government cannot show that they were anything more than

"online puffery to shock or impress his online friends." *Motion*, ECF No. 11, at 9. But there is no evidence to suggest that he renounced those beliefs or statements. Moreover, it is not the statements alone that make Morris dangerous. Rather, those statements in conjunction with Morris' mental health struggles and his possession of an aresnal of weapons, including two machineguns, that demonstrate that he is a danger to the community.

At least one of his family members recognized the danger Morris poses to the community. In a November 2020 interview, one of Morris's family members told FBI that Morris reminds them of what they read about the Columbine High School shooters. The family member told agents that Morris's love for firearms coupled with his ideology is concerning. Images of Morris's "gun room" show the coupeling of his ideology and unlawful possession of machineguns:



The investigation revealed that Morris was previously a member of the New England Minutemen, a group of like-minded individuals who participate in training throughtout New England. A confidential source reported that in July of 2020 Morris was removed from the New England Minutemen encrypted chatroom for expressing anger and violent sentiments deemed overly concerning by other members. Members reported that Morris did not like the fact that the

7

New England Minutemen supported training and patience, and were concerned that Morris was someone who would commit a mass shooting.

VI. <u>Morris' lack of candor weighs in favor of detention</u>.

When questioned by probation about his drug use history, Morris said that he had used marijuana five or six times and last used six months before his arrest – January of 2022. Yet during the search of Morris' house in mid-February 2022, law enforcement found a bong and a jar filled with marijuana in his bedroom:

  

Morris did not claim ownership of the marijuana found in his room, but he did tell law enforcement that it did not belong to his girlfriend.

Morris's cellphone contained evidence relating to growing and smoking marijuana. He conducted internet searches how to grow marijuana, searching, for example, "Marijuana grow phases," "Growing marijuana light schedules," "when to transplant out of red solo," "How long do seedlings stay in red solo cup," and "How long in jail for growing marijuana." The phone contained images that appear to show marijuana plants growing in red solo cups, as well as various quantities of marijuana:



Based upon the evidence found in Morris' bedroom and on his cellphone, it appears that Morris was not candid with probation about his drug use history. He appears to have used more marijuana than he reported and more recently than he reported. Despite the fact that he tested clean on the date of his arrest, this lack of candor raises concerns regarding safety of the community and whether Morris would comply with conditions of release.

Similarly, when asked whether he possessed firearms or dangerous weapons, Morris did not report his ownership of a dagger/knife that was stored in his firearm closet:



And while airsoft guns are not firearms, Morris' failure to disclose them could have put probation in a dangerous situation had a probation officer arrived at the home and saw what appeared to be a firearm. Morris' failure to disclose the knife and failure to discuss his airsoft guns raises concerns that he will not be fully transparent with probation if he were released on conditions.

Morris's claim that his cellphone was broken in a car accident rather than an attempt to destroy evidence appears to obfuscate the truth. *See, Motion*, ECF No. 11, at 2. Morris was involved in a serious car accident in September of 2020. It is possible that the phone was broken during that accident because the most recent activity on the phone was from that time period. Assuming it was broken during that accident, Morris kept the phone for over seven months before smashing it and throwing it away. Indeed, he only tried to destroy the phone after he was confronted about his involvement in NSC131 by law enforcement on May 26, 2021. Moreover, his new claim is inconsistent with statements he made during a February 2022 interview, when Morris denied purposely damaging a phone and denied throwing a phone away. This partial truth is another example of Morris's lack of candor and indicates that he will not abide by conditions of release.

VII. <u>Morris's belief that all authority is illegitimate indicates that he will not abide by release conditions</u>.

Following Morris' June 16, 2022, arrest, Morris asked law enforcement about the pending charges. Upon hearing that he was charged with a firearms offense, Morris told law enforcement that federal firearms laws are just "paper laws" and that the FBI had no authority over him.

Before the detention hearing, Morris spoke about this conversation on a recorded jail call. During that call, Morris claimed that he did not say that FBI lacked authority over him. Rather, he said that "all authority is illegitimate." This statement indicates that Morris will not abide by any release conditions that this Court could set.

VIII. <u>Morris's family ties and military history do not warrant release</u>.

Morris argues that he should be released in light of his family ties to the community, his employment history, and his prior military service. His employment and family ties were not a

stabilizing factor for Morris since his discharge from the military, and these factors did not deter Morris from possessing machineguns.

IX. Morris poses a danger to the community.

Morris, through online chatrooms and conversations with those close with him, demonstrated his idolization, planning, and encouragement of hate filled violence. In his conversations, he also encouraged others to commit acts of violence. Further, he has demonstrated he has the access, knowledge, and skills necessary to convert a firearm into a machinegun. The nature of this crime, combined with Morris' violent rhetoric and membership in a neo-Nazi organization, demonstrate that the defendant poses a danger to the community.

There is "no condition or combination of conditions" that will reasonably assure the safety of any other person and the community. 18 U.S.C. § 3142(e). Release on conditions "would not necessarily inhibit the defendant from contacting … like-minded individuals to arrange acts of violence against … others with whom he takes issue because of their race, gender, religion, or sexual orientation." *United States v. Zrallack*, No. 3:10CR68 (JCH), 2010 WL 2682527, at *4 (D. Conn. July 2, 2010) ("[G]iven the strength of the government's case and the likelihood that the defendant will be convicted and incarcerated, releasing the defendant to home confinement is likely to provide his last chance for a while to act on the beliefs which have apparently fueled his involvement in this organization for most of his adult life.").

X. Conclusion

The nature and circumstances of the offense charged, the weight of the evidence, and the danger to the community outbalance other elements in Morris' personal history and characteristics arguably supporting release, including his ties to New Hampshire and his military service, even under strict conditions. Morris should be detained pending trial.

11

Respectfully submitted,

JANE E. YOUNG
United States Attorney

Date: June 29, 2022         /s/ Anna Z. Krasinski
                            Assistant U.S. Attorney
                            WV Bar # 12762
                            53 Pleasant Street, 4th Floor
                            Concord, New Hampshire 03301
                            (603) 225-1552
                            anna.krasinski@usdoj.gov