1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE

2

3    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                         *
4    UNITED STATES OF AMERICA            *
                                         *
5                                        *  No. 1:22-cr-00068-SE
               v.                        *  July 8, 2022
6                                        *  3:36 p.m.
                                         *
7    KYLE MORRIS,                        *
                                         *
8                    Defendant.          *
                                         *
9    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

10

                    TRANSCRIPT OF MOTION HEARING

11

              BEFORE THE HONORABLE SAMANTHA D. ELLIOTT

12

13
     APPEARANCES:

14

15   For the Government:       Anna Z. Krasinski, AUSA
                               United States Attorney's Office

16

17   For the Defendant:        Charles J. Keefe, Esq.
                               Wilson Bush & Keefe, PC

18

19   U.S. Probation:           Karin Hess

20

     Court Reporter:           Brenda K. Hancock, RMR, CRR
21                             Official Court Reporter
                               United States District Court
22                             55 Pleasant Street
                               Concord, NH 03301
23                             (603) 225-1454

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  All rise for the Honorable Court.  Please

3    be seated.

4          Court is in session and has for consideration a motion

5    hearing in <u>United States of America versus Kyle Morris</u>,

6    criminal case number 22-cr-68-1-SE.

7          And, for the record, can I have counsel identify

8    themselves.

9          MS. KRASINSKI:  Anna Krasinski on behalf of the

10   government.

11         MR. KEEFE:  Charles Keefe on behalf of Kyle Morris,

12   your Honor.

13         THE COURT:  Thank you.  Good afternoon, everybody.

14         MR. KEEFE:  Good afternoon.

15         THE COURT:  Good afternoon, Mr. Morris.

16         THE DEFENDANT:  Good afternoon, your Honor.

17         THE COURT:  So, before we consider anything,

18   Mr. Morris, I want to talk to you a little bit about some of

19   your rights.  I know that Magistrate Judge Johnstone went over

20   these with you last time and the first time you appeared before

21   her, but I'm going to go over them again.  Okay?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  So, you understand that you have the right

24   not to make any statements?

25         THE DEFENDANT:  I understand.

1          THE COURT:  And, if you do make any statements and
2     then you decide to stop, you can stop at any time.  Do you
3     understand that?
4          THE DEFENDANT:  I understand that.
5          THE COURT:  And that anything you do say can be used
6     against you?
7          THE DEFENDANT:  Yes, your Honor.
8          THE COURT:  Okay.  So, do I understand that you no
9     longer want appointed counsel, and you've hired Attorney Keefe
10    to represent you?
11         THE DEFENDANT:  Yes, your Honor.
12         THE COURT:  Okay.  Thank you.  You can be seated.
13         So, Mr. Morris, we're here today to talk about
14    pretrial confinement.  I've read your motions, I've read the
15    government's motions, and I just want to explain what's going
16    to happen today.  I see that we have a courtroom full of
17    people.
18         So, before we begin, the government must prove by
19    clear and convincing evidence that no condition or combination
20    of conditions of release will reasonably assure the safety of
21    any other person or the community.  Nobody is arguing that
22    there's any risk that Mr. Morris is going to flee.
23         So, I need to review the Magistrate Judge's decision
24    *de novo*.  That means I take a brand new look at it.  It doesn't
25    mean that we have to recreate the wheel here, but it means that

1   I'm going to look at all of the evidence that you guys present

2   to me, all of the evidence that's contained in the briefings

3   that I've already read, and make my own decision about what

4   should happen at this stage of the proceedings.

5        You understand?

6        THE DEFENDANT:  I understand, your Honor.

7        THE COURT:  Okay.  What I have reviewed so far:  I

8   have listened to the June 21st hearing before the Magistrate

9   Judge; I read the Pretrial Services Report; I have reviewed the

10  order of detention pending trial, that's the order that you're

11  asking me to reconsider today; and I've reviewed all of the

12  motions and objections.  I want you to know that, because I

13  want you to know that we've looked at this very carefully

14  before we got here today, but I'm also looking forward to

15  hearing from both the government and your attorney before I

16  make any decisions.  Okay?

17       THE DEFENDANT:  Yes, your Honor.

18       THE COURT:  Okay.  Attorney Keefe, we're here on your

19  motion, so please proceed.

20       MR. KEEFE:  Thank you, your Honor.  Good afternoon.

21       Your Honor, we're here, obviously, pursuant to

22  Attorney Levin's motion for the revocation of the detention

23  order, and I'll be up front with what we're asking for.  We're

24  asking for the Court to release Kyle on electronic monitoring,

25  that his grandparents, who are here in the courtroom today and

1    live two miles from him, be third-party custodians; obviously,

2    no firearms, no alcohol, no illegal substances, no Internet

3    usage; and, I will get to this secondarily, comply with all

4    mental health and substance abuse recommendations either from

5    Probation, the Court, or the Veterans Justice Program.

6           There's a representative from that program here today

7    who has met with Kyle, and I'll talk about that in a little

8    bit.

9           And, obviously, on top of that any and all other

10   conditions the Court would impose.

11          So, we're not just asking for Kyle to be released,

12   like he did at his original hearing.  We're asking for a very

13   strict and limited kind of release here in light of the time he

14   has already spent incarcerated.

15          First, the Court is familiar with Kyle's biographical

16   information.  He has with him today a roomful of family and

17   friends and supporters.  This is a reflection of who Kyle is

18   right now, and I'd like the Court to not only see that but

19   recognize, in light of the allegations here and the things that

20   have been made public about Kyle's past, all of these people

21   are here today, standing behind him.

22          As the Court knows from the Pretrial Services Report,

23   Kyle has lived his entire life in New Hampshire at -- well, I

24   was going to say 22.  He just turned 23 yesterday while

25   incarcerated.  He's a homeowner.  He, importantly, is a

1    decorated, honorably discharged veteran from the United States

2    Military.  He has, while there and the Court saw it, I think

3    it's worth noting that Kyle joined -- he graduated high school

4    early in order to join the United States Army.  While there, he

5    served honorably in combat in an FBO in Afghanistan, and this

6    is going to be something I'm going to come back to.

7            As a country, we sent a teenager to war.  He was

8    subjected to not only combat there but various people and views

9    that -- a teenager is very impressionable at that age.  What

10   Kyle will swear under oath today and will represent through me

11   is that some of the or all of the things that the government

12   cited in its search warrant about that may be considered white

13   nationalist or racist in any way, he denounces all of that.

14           And what the Court will see through the timeline arc

15   of this case, if you look at -- I don't know if you read the

16   search warrant affidavit.  Much of the government's evidence,

17   the bulk of it, is from the summer of 2020, and he came home

18   from Afghanistan in February of 2020, and he came home, we went

19   into the pandemic and he was --

20           THE DEFENDANT:  20 years old.

21           MR. KEEFE:  -- 20 years old.  But through the timeline

22   since then, your Honor, you have a young man who's grown up,

23   who is 23 yesterday, matured and grown away from some of those

24   -- or all of those things, I should say --

25           THE DEFENDANT:  Yes.

1          MR. KEEFE:  -- that the government cites in its

2    various pleadings to try and incarcerate him or keep him

3    incarcerated.  He is in a committed relationship, and that

4    young woman is here today.  Importantly, her family is with her

5    today, knowing who Kyle is and knowing what he's accused of and

6    knowing what the government has put in its pleadings and what

7    has been made public about Kyle.  Her name is Anna Maria -- I

8    don't want to butcher the last name -- Holodowska?

9          Did I pronounce that correctly?

10         And she, for the most part, lived with Kyle prior to

11   his incarceration.  And he, as the Court has seen, is able to

12   afford his home by renting out various rooms to people in his

13   home.

14         I want to talk now about something significant, at

15   least we believe is significant since Kyle was before Judge

16   Johnstone.  He has met with and been, at least preliminarily, I

17   think it's fair to say, evaluated by Christopher Dearborn from

18   the Veterans Justice Program.  He is here today in the

19   courtroom.  They met for approximately one hour, and at the end

20   of that meeting Mr. Dearborn found that Kyle meets the full

21   criteria for a major depressive disorder, for panic disorder

22   with agoraphobia.  He reports symptoms related to PTSD, but an

23   additional assessment would be required.  PTSD and a mood

24   disorder should be considered within the context of

25   comorbidity, which I understand is existing at the same time,

1    and I will talk about this as well, alcohol and marijuana use

2    disorder that appear to be in full remission.  I know the

3    government makes much of marijuana in its effort to keep Kyle

4    behind bars, so I will talk about that.

5           Kyle identified to Mr. Dearborn PTSD anxiety,

6    depression and panic attacks as his primary mental health

7    concerns.  They are all related to his deployment in

8    Afghanistan between 2018 and 2019, and they started to grow,

9    which is typical, beginning in the months after he came home.

10   So, in the 2 to 12 months after he returned from service are

11   when these issues grew in Kyle's life.

12          Depression is a primary concern, reflected by a lack

13   of motivation, constant thoughts of death, hypersomnia,

14   decreased optimism, negative thinking and weight gain.  Kyle

15   gained 40 pounds when he came home, which is one of the many

16   physical signs of depression.  He lost his job that he had

17   because of depression.  He reports panic attacks since his

18   return from service.  His change in emotional response has

19   developed, again which is typical.  He has a physical response

20   to yelling, his startle reaction has increased, and he is what

21   would be described as hypervigilant.  He's also had negative

22   changes in thinking, low self-concept, emotional lability and

23   anger and sense of a shortened future.

24          These are, sadly, common traits of young men who see

25   combat and then come home without the proper support.  And

1    Kyle's getting that now; Mr. Dearborn is offering those

2    services.  And although, and Mr. Dearborn was frank, he said

3    Kyle appears to minimize his exposure to potential trauma

4    related to his FOB deployment, being subjected to routine

5    mortar fire, he did report a three-day attack firefight that to

6    this day causes him stress.

7          He has nightmares, which is no surprise, problems with

8    anxiety, including fatigue, concentration, irritability, lack

9    of sleep, and, which is a sad cycle many people get in, he

10   worries about having panic attacks because of what he

11   experiences during a panic attack.

12         He agrees with Mr. Dearborn that he could be

13   perseverative, angry and have worrisome thoughts about

14   politics.  His symptoms of anxiety are not mutually exclusive

15   from combat trauma symptoms.  According to Kyle's interview

16   with Mr. Dearborn, he had mild problems with panic attacks in

17   September of 2020, but by the end of the year they grew into

18   full panic attacks.

19         He agreed -- and it's something that I guess I'll talk

20   about now, is the marijuana.  He agreed with Mr. Dearborn that

21   he smoked a lot of marijuana after he was discharged from the

22   Army, and he generally stopped in approximately September 2020.

23   He believes, his best memory is, the last time he smoked

24   marijuana was either in December of 2021 or New Year's Eve, New

25   Year's Day of 2022.

1          The government has pictures of marijuana and web

2     searches related to marijuana and I think text or messages

3     related to marijuana.  They can't say when the last time Kyle

4     smoked marijuana was.  Although the Pretrial Services Report I

5     think indicates Kyle wasn't able to produce a urine sample when

6     he first came in, he was -- and he was clean; he didn't have

7     any marijuana in his system.  The government can't say when the

8     last time he smoked marijuana or the last time the very small

9     bong they found in his bedroom was used, and the amount of

10    marijuana they found in his bedroom is a violation-level

11    offense in New Hampshire.  He would get a ticket for it, if the

12    Salem Police had located that.

13         He has stopped drinking alcohol approximately a year

14    ago.  However, Mr. Dearborn would testify that that's an Axis I

15    diagnosis.  At this point he would need to do further clinical

16    assessment for Axis II and III.

17         However, importantly, Mr. Dearborn is willing to

18    coordinate and work with Kyle to get him substance abuse,

19    psychological, mental health services, whatever the Veterans

20    Administration can provide Kyle, including a further mental

21    health assessment to diagnosis him on Axis II and III to see

22    what other services he needs, and that would obviously be in

23    conjunction with probation.

24         As the Court is aware, Kyle has zero criminal history.

25    He had never been arrested.

1          I don't have -- I don't think there was even any

2    indication of a motor vehicle offense on your record.

3          So, this is someone who's not only received many

4    medals through the United States Army for service; he has no

5    criminal record whatsoever.  The Court has seen both in

6    Attorney Levin's motion and I think in the Pretrial Services

7    Report the medals that Kyle received while he was in the Army.

8          The people in the home where Kyle lives to whom he

9    rents, that nobody has a criminal record.  Again, they are

10   aware of what Kyle is charged with.  I think there is a cat in

11   the home or a hamster or something like that, so there are no

12   dangerous animals in the home.  Nobody has a criminal record.

13         Kyle's family ties are immense, as reflected here.

14   The government relies on two family members in their case, at

15   least that we're aware of at this point.  One is Kyle's

16   estranged wife, who I think in the search warrant application

17   is described as S1.  So, there is an understanding why an

18   estranged ex-wife may not have the best things to say about an

19   estranged ex-husband.  And S2, the other family member, who

20   claims to have known Kyle for many years, is his aunt, who

21   doesn't know who Kyle is anymore.

22         Is that fair to say?

23         THE DEFENDANT:  I rarely see her, yes.

24         MR. KEEFE:  Rarely sees her.  These are the people

25   (indicating) who sees Kyle every day in his life and are here

1   to support him, should the Court allow his release.

2          He has three grandparents, all live in New Hampshire.

3   Two are in Salem, the two grandparents to whom we're asking the

4   Court release him as third-party custodians, and one in

5   Merrimack, New Hampshire.  His sister, who is here today, lives

6   in New Hampshire.  As I said, he as an incredibly strong

7   relationship with his girlfriend, Anna.

8          I want to switch gears at this point, your Honor.  The

9   government wants to keep Kyle detained for several reasons and

10  factual allegations.  I want to talk about timeline here.  The

11  government conducted the search of Kyle's home where the

12  subject firearms were located in February of 2022, more than

13  four months prior to his arrest or approximately four months.

14  So, for four months the government was aware of all the

15  information that it's brought before your Honor to keep him

16  detained, and they didn't seek an arrest warrant to immediately

17  get him in custody and get him on pretrial release or have him

18  detained.  They were okay with having him in the community for

19  four months.

20         In June of 2021 it appears they obtained his cell

21  phone or records from his cell phone.  They cite to

22  conversations.  And, again, as I said earlier, the bulk of

23  their evidence seems to revolve around the summer of 2020.  In

24  the search warrant application they talk about a conversation

25  in July of 2020 about selling an AK-47.  There are other

1   messages about either white nationalist or could be construed

2   as racist from July of 2020.  I want to point out that was two

3   years ago.  He was 20 or 21, just turned 21 at that point.  The

4   young man not only has grown up, but there is a staleness issue

5   which is going to be addressed in a motion to suppress, but

6   also the Court should consider the staleness when it's

7   considering whether to detain Kyle at this point.

8          For all of the information the government relies upon

9   here, there's no intention he ever actually physically did

10   anything.  The government cites to a lot of words, but there's

11   no allegations that he made physical steps to harm anyone, and

12   I think that's important for the Court to realize.  They

13   approached him in May of 2021, so he was aware that he was

14   being investigated.  On the day he was arrested he actually

15   offered to turn himself in.  He has demonstrated by not

16   committing any acts of violence that he is not a danger.

17          The investigation continued since that point.  In July

18   of '20, again, talking about the timeline, the government spoke

19   to an informant.  In October of 20 Kyle reached out to agents.

20   The government apparently seized through the mail World War II

21   paraphernalia.  They focus on, and they do this in their

22   objection to Attorney Levin's motion, German Nazi memorabilia

23   that was found in his home.  What they don't disclose that was

24   also in the home from World War II and World War I were United

25   States Military paraphernalia, Russian paraphernalia,

1   Yugoslavian paraphernalia, Italian as well.  So, the government

2   wants to focus on just one small slice of everything that was

3   in the home.

4        The web search results that the government relies upon

5   are from 2018, five years ago, 2019 and 2020.  The notes that

6   it cites found in his phone are from 2019 and 2020.  The photos

7   of the marijuana are from 2020.  This young man is not a

8   danger, your Honor.  He has no arrests.  He's demonstrated no

9   acts of violence, and there's no evidence of him ever doing

10  anything violent or threatening to anyone.

11       There's something else I'd like to touch upon, is the

12  government has used the phrase "abusing marijuana."  We can

13  have an argument about whether that even makes sense, to say

14  that somebody abuses marijuana.  The government does not have

15  any evidence that Kyle regularly smoked marijuana.  Again, he

16  would testify under oath that the last time that he smoked was

17  in December of 2021 or January of 2022.  He can't remember.  He

18  doesn't like it because of the way it makes him feel.  As the

19  panic attacks and PTSD have grown, the marijuana has actually

20  hurt him in a way.  It's made him feel worse.

21       The government also relies upon, and I'll talk about

22  this more, actually, I want to talk specifically about the

23  factors the Court has to evaluate here, but before I get to

24  that I just want to make sure the Court is aware the Pretrial

25  Services Report reflected that Kyle didn't report a handgun, a

1    rifle and a dagger to the pretrial services officer.  His

2    understanding and recollection is that he was asked about

3    handguns or guns, firearms.  The handgun and rifle are

4    airsofts; they are not actual firearms.  He would testify that

5    the dagger, which is -- it's a World War II dagger.  It's a

6    piece of war memorabilia.  He did not understand he needs to

7    disclose that.  And he did disclose the handgun and rifle, the

8    actual ones that he did have.

9         Speaking to the factors the Court must consider, the

10   nature and circumstances of the offense, they're alleging that

11   Kyle possessed these weapons.  However, there's no evidence he

12   intended to use them or he threatened anyone with them or that

13   he did anything with them at all other than have them.  Whether

14   they're actually machine guns and capable of being fully

15   automatic, and whether Kyle knew that they were, we submit

16   those are subjects that the government has to prove beyond a

17   reasonable doubt and are subject to dispute.

18        We have not had an opportunity for our own expert to

19   review these or even the government's reports on these matters,

20   and the government's motion on knowledge relies upon evidence

21   that is more than a year old and references a conversation in

22   2020.  They're using old Internet searches and old

23   conversations to try and demonstrate knowledge of something

24   that they found in 2022.  So, we submit the government has a

25   knowledge problem here.  We will leave that up to a jury or a

1    court at a later date.

2         The weight of the evidence, your Honor, I somewhat

3    addressed that, but, as Attorney Levin pointed out, that is the

4    least important factor in the Court's analysis.  The government

5    relies upon an allegation that Kyle tried to sell an AK-47

6    again in July of 2020.  That is incredibly far from probative

7    about his mental state regarding these two firearms in 2022.

8         The government relies upon discussion of racially

9    motivated mass shootings, and, as disgusting as those things

10   may be, that's just what they were, discussion, and, again, in

11   July of 2020.  The government tries to burden shift by saying

12   that Kyle hasn't renounced those beliefs.  He does here, not

13   only on the record, before your Honor, in front of his entire

14   family, in front of the government.

15        But he does continue with his mental health struggles;

16   we admit that.  However, it appears the government tries to

17   turn that into a sword to say that this honorably discharged,

18   decorated veteran of combat on behalf of the United States

19   Military, who could legally possess weapons in general and has

20   mental health issues related to his combat, the Court can

21   somehow use his mental health difficulties as a reason to keep

22   him behind bars.  Mr. Dearborn is here today to reflect that

23   this is someone who needs help, not incarceration.

24        The government also asserts that Kyle lacked candor

25   regarding marijuana and his marijuana use.  We submit that the

1    statements he made do not show he was not telling the truth.

2    Again, nobody -- the government can't say when the last time he

3    ever smoked marijuana was, and their searches about whether

4    evidence about cultivating marijuana go back to 2020.  So,

5    again, they're not remotely probative of who Kyle is right now.

6    And there's no evidence that he ever acted on that.  Looking up

7    on the Internet how to grow marijuana, whether -- and he's

8    lived in Salem, your Honor.  The marijuana cultivation industry

9    in Massachusetts has exploded.  He lives on the New

10   Hampshire-Massachusetts line.  I represent several clients who

11   are in that line of business legally in Massachusetts.  But,

12   importantly, the government can't say he ever actually did

13   anything to grow marijuana.  This is the epitome of the

14   government's reasoning, rationale or case to keep Kyle

15   incarcerated.

16          And I want to talk about something that is concerning

17   to me, as Kyle's defense attorney.  On July 1 two agents went

18   to speak with Kyle's girlfriend.  Ms. Holodowska is here today,

19   and she would testify that she felt the agents were there to

20   manipulate her in several ways, to make Kyle look badly in her

21   eyes, to get her to offer evidence against him.  They told her

22   that Kyle was just manipulating her, she is so young and that

23   her life is just starting.  They told her Kyle's sister is an

24   enabler.  They showed her messages from other people about

25   Kyle.  They told her Kyle might try to use her in the future,

1    and they told her Kyle's relationship with her was not real,

2    and in the end they asked her if this is the guy she really

3    wants to be with.

4         If I had a defense investigator speak to a government

5    witness that even came remotely close to saying anything like

6    that, I expect I would be in front of your Honor within 24

7    hours, along with my defense investigator.  But, again, this is

8    what the government is doing to try and keep Kyle incarcerated.

9    He's a young man who needs help.  We're asking the Court, as it

10   must, to consider all reasonable, least-restrictive

11   alternatives to detention.

12        This is not a presumption case.  Detention on

13   dangerous grounds, as courts and Congress has said, is limited

14   to only particularly dangerous defendants.

15        And I don't want to sound too preachy, your Honor, but

16   we, as a country, sent a boy to war.  We asked him to put his

17   life at risk for our country, and he came home damaged.  This

18   is what we see in this case, a boy that is now growing into a

19   man, who's had very real and substantial internal injuries.  He

20   served our country with honor and he is still -- he just turned

21   23 -- he is still growing up.  He put his life at risk for our

22   country.  He was changed by that experience.

23        As he's grown, and this is why the evidence of any

24   white nationalist or racist material has decreased over time,

25   he's growing up and he's growing away from that, which is why

1   he absolutely denounces it now; and the farther he gets away

2   from his combat experience and his time in the military and he

3   grows up, he recognizes how awful those thoughts and statements

4   were.

5         We ask the Court to place him on electronic monitoring

6   with a third-party custodian and for all the other conditions

7   that we've offered the Court and any other conditions the Court

8   would suggest.

9         I've been going on for a while now.  I'm going to

10  conclude at this point, but I'm open to answer any questions

11  your Honor may have.

12        THE COURT:  Thank you.  And I'm sure I'll have some

13  questions, but I'm going to hear from Attorney Krasinski first.

14        MR. KEEFE:  Thank you.

15        MS. KRASINSKI:  Thank you, your Honor.  I think I want

16  to start by just sort of taking a step back and talking about

17  how we got here and then, after going through that, I want to

18  address some of my colleague's points that he raised.

19        So, this all started because in August of 2022 the FBI

20  gets this report that there's this guy, he's a part of a

21  militia group, the New England Minutemen, and that it's

22  reported to the FBI that he's kicked out of this group because

23  he's too violent, essentially.  In their words he's probably

24  going to follow in the footsteps of Dylan Klebold, and that's

25  one of the Columbine High School shooters.  He didn't like the

1    fact that we support training and patience.  He wanted to mag

2    dump a crowd of Black Lives Matter protesters, especially the

3    darker ones.

4           So, this is what the FBI is told, and the first thing

5    they have to do is sift through a bunch of really important

6    issues.  First, is this a real report, you know, is the

7    information that they've received accurate?  If it is, who is

8    this person.

9           THE COURT:  What was the date on that, did you say?

10          MS. KRASINSKI:  It's August of 2020.  I don't have the

11   exact date.

12          THE COURT:  Okay.  Thank you.

13          MS. KRASINSKI:  And then, if they can identify the

14   person, if they can determine that the report is actually based

15   in some sort of fact, then they have to do sort of the second

16   step of is this person just saying distasteful things, or is

17   this person planning to commit an offense, is this person

18   already committing an offense?

19          And so, the FBI sort of undertakes this big task to

20   figure out what in the world is going on and does it even

21   amount to anything.  So, they start investigating, and

22   ultimately they were actually able to confirm that that is why

23   he was no longer in New England Minutemen, and they were able

24   to do that by one of the notes the defendant had written in his

25   phone, right?  So, not something for public consumption, not a

1    text to someone, but his own personal note, where he said he

2    was resigning from his team leader position and leaving the New

3    England Minutemen.

4         And I'm going to quote now:  The first time we got

5    opposition we cower.  I have heard every excuse in the book.

6    We hide when, a curse here, gets real, and we bow down to BLM

7    and the government.  We removed a patriot from the group

8    because he broke the law.  You see how f'ing ironic that is?

9    Peace is not an option for me.  I guess I'm an accelerationist.

10   The people who ruined our country need to be executed.

11        And it goes on a little bit longer.  And the date of

12   that is August 7th, 2020.

13        So, the FBI is able to identify that the individual

14   that was being reported about was Kyle Morris.  They were able

15   to at least confirm that he wasn't in the militia group anymore

16   because he had sort of more radical views than the militia.

17        And then, in July of 2020, so I guess around the same

18   time, in July of 2020 the defendant is in a Telegram group with

19   a few other people, and that's where he made some of the

20   statements that are in the government's pleading, and those

21   include, I'm at the point where I would support mass

22   deportation and genocide for those who don't leave, SS rushing

23   the ghetto, blasting anything that moved.

24        I know the Court is familiar with the discussions of

25   sort of these ten lone-wolf attacks --

1          THE COURT:  Yes.

2          MS. KRASINSKI:  -- culminating in one big one.  And in

3     August of 2020 he also in that group, you know, actually sort

4     of discussed his family's, well, specifically his sister's

5     impact on him, and I'm going to quote again.  After my sister

6     stopped talking to me I really tried to see it from her point

7     of view.  I tried to de-radicalize myself, if you will.  I did

8     that for two days.  I watched Holocaust documentaries and

9     listened to blacks talk about their issues.  Not only did my

10    views not change, but now they're more solid than they ever

11    were.  It's utter BS and constant garbage that they spit out.

12    We have kept the exact same narrative for hundreds of years.  I

13    encourage you to put yourself in the enemy's shoes.  I want

14    death squads.  Hail victory.

15          So, the FBI is looking at all of this, and they're

16    still trying to evaluate are these just statements?  Is this

17    just, as the defendant has put it, edgy humor, dark humor, or

18    is it something more sinister or more serious?  And so, the FBI

19    starts getting notifications that the defendant is starting to

20    buy guns.

21          And I agree with Mr. Keefe that, setting the marijuana

22    issue aside, there's nothing that prohibits him from possessing

23    a firearm, but I think it's also fair to understand that, when

24    reviewing these messages, and then seeing that in October of

25    2020, in February, April, and May of 2021 he's going out and

1    buying multiple firearms, I mean, that's concerning.

2            And then in March of 2021, while the FBI is still

3    trying to sift through all of this, they learn that Mr. Morris

4    applied for a job with the Department of Homeland Security

5    Federal Protective Services essentially through a contractor to

6    work as security in a federal building.  Now, this also raises

7    concerns for the FBI, because here's someone who has made

8    statements about blowing up a state building who is now

9    applying for a job to work in a federal building.  As with many

10   federal jobs, I suspect you had to do this, too, you have to

11   fill out the SF-85, and Morris did that, you know, background

12   information, information about his family, his job and answer a

13   lot of questions.  And FBI worked with Homeland Security to set

14   up a ruse interview based on this, and they set up sort of a

15   ruse job interview where a task force officer and a Homeland

16   Security officer sat down with him and went over his answers to

17   the SF-85.  They reminded him that, along with filling out the

18   form itself, that, when talking to them, if he didn't tell them

19   the truth a lie could subject him potentially to charges under

20   1001, and then they proceeded to go through the form with him

21   and asked him very specific questions, and I just want to talk

22   about two of those.

23           So, during the conversation one of the task force

24   officers asked him about social media applications, because

25   they had learned that he had been using a number of encrypted

1    applications, Telegram, for example, and asked him about that

2    and social media, and Mr. Morris denied using any encrypted

3    applications.  And I want to be clear he was asked about

4    specific applications:  Do you use Telegram?  No.  Do you use

5    WhatsApp?  No.  Do you use Signal?  No.  Now, we know this to

6    be false, because we've seen his phone, and we had source

7    reporting, and we know he was using Telegram.

8            And one of the other areas of questioning was whether

9    or not he was associated with any extremist groups or gangs,

10   and he denied membership in any extremist groups or gangs.

11   But, again, he was asked about very specific groups.  He was

12   asked about a whole list of groups, and he was specifically

13   asked whether he had an association with NSC-131, and he said,

14   No.  But we know from source reporting that he was a member of

15   the probate (ph) chat Telegram group for NSC-131, which I sort

16   of liken to pledging a fraternity.  And so, can I stand here

17   and say he was ever a full member of NSC-131?  I can't.  But

18   just like if you pledged a fraternity or a sorority, you would

19   have an association with that fraternity or sorority.  Being in

20   this probate (ph) chat for NSC-131 is equivalent.  So, saying

21   that he had no association was not correct.

22           And at the end of this they sort of call him out on

23   it.  They ask him, Who's Koyle (ph), which is the online

24   pseudonym that he uses, and he ultimately confirms it's him.

25   He admits that he lied to them, and he very quickly, when they

1   ask if he'll show them the leader of NSC-131, sort of shows

2   them on his phone really quickly and then puts his phone away.

3   And so, we know that the things that he initially said during

4   his interview were wrong.  They were lies.  So, that's May 26th

5   of 2021.

6           A few weeks later, in June of 2021, Morris, Mr. Morris

7   throws away two computer towers, so maybe 2 1/2 weeks after

8   this interview, and the FBI goes and they do a trash pull.  The

9   towers at this point are gone.  They get there I think two or

10  three days after he put the stuff in the trash, but his smashed

11  cell phone is still in the trash.  So, they seize the phone,

12  and they ultimately are able to examine the phone.  But this

13  isn't a quick process.  It's a smashed phone.  They have to

14  send it off to be extracted, and then, when that process is

15  finally done, they have to take the time to go through

16  everything in the phone, and there were some things in the

17  phone that they found that discussed fully automatic weapons.

18  And I know your Honor is familiar with some of that, but there

19  are more than what was in sort of the government's pleadings,

20  including talking about, We could shred with a full-auto .308,

21  full-auto AR-10 with that mounted on an armored truck, and I

22  have armor-piercing rounds.

23          So, once ATF or, excuse me, FBI has had the time to

24  actually get the phone examined and go through all the contents

25  of the phone, they finally are able to get a warrant to search

1    his house.  They get that warrant in February of this year, and

2    they execute that warrant on February 16th of this year.  And

3    upstairs in the house there is essentially a gun room, about 25

4    firearms.  ATF is there, and they do a cursory review of some

5    of the firearms.  They identify two, the ones that are listed

6    in the indictment, as potentially full auto they need to get

7    examined further.

8          So, the FBI sends those to their lab, where they are

9    examined by an expert who prepared a report.  The report is

10   dated May 17th of this year.  I double checked today the date I

11   received that, and I received that lab report on May 25th of

12   this year, identifying that both of those firearms are fully

13   automatic.  It also identifies that one of those has a barrel

14   that's too short, but it's so small I'm not sure what you would

15   notice.  It's about a quarter of an inch too small.  So,

16   definitely not charged with that.  I don't think that there's

17   any way that anyone would know that that barrel length was

18   shorter than it ought to be.

19         So, May 25th of this year is when we have sufficient

20   evidence to charge him with a crime.  The grand jury returns an

21   indictment on June 13th of this year.

22         So, I mean, I know that there were some questions

23   about timing, and investigations take a long time.  Once the

24   government had the reports that these were fully automatic

25   firearms we moved forward.

1        And I just very, very briefly want to address the

2   issue about the expert reports.  I just want to be very clear.

3   I take my discovery obligations very seriously.  The expert

4   report has already been disclosed, as has the expert's CV, and

5   I've already made the expert disclosure, so that's done.

6   Certainly, if the defense wants time to have their own expert

7   examine these, I don't have any issue with that, but to the

8   extent that there was any miscommunication about those reports

9   not being disclosed, they have been.

10        So, that's sort of what brings us here today.  And I

11   think the first thing I want to address is just the marijuana,

12   because I want to be very clear.  I really don't care much

13   about whether or not he smoked marijuana.  What I care about is

14   that when he spoke to Probation he said he had used marijuana

15   five to six times.  That is not consistent with what Attorney

16   Keefe said today, even, where he had previously smoked a lot of

17   marijuana.  So, I really don't care if -- if he had disclosed

18   to Probation that, I've smoked five times a day for five years,

19   I'm not sure that would move the pendulum either way when we're

20   looking at the factors in the Bail Reform Act.  But I do think

21   the first time you're faced with federal probation and you're

22   not candid about your marijuana use, that raises concerns for

23   me that you're not going to be candid about other things, about

24   things that are more significant, things that are going to make

25   it really difficult for Probation to make sure that you're

1   complying with your conditions of release, and that's what I

2   care about about the marijuana.

3          I also want to address Mr. Morris's family support.  I

4   applaud his family.  I think every single person and,

5   particularly, every defendant deserves a family that is willing

6   to support them through the hardest times, and I am glad that

7   they're here today.  My concern, when I'm looking at the Bail

8   Reform Act, is that this family support was in effect

9   throughout this entire period, and it wasn't a stabilizing

10  factor for him.  It's not something as if they've come in now

11  and so all of a sudden something is different.  They were here

12  the whole time.  They were here when he possessed these machine

13  guns.  They were here when he was in New Hampshire and

14  radicalized.  So, while I applaud them, I just don't see that

15  as a factor that weighs in favor of release or demonstrating

16  that he'll comply with conditions, because it didn't serve as a

17  stabilizing factor for him before that.

18         And I think one of the biggest issues I want to

19  address is this idea that he's matured and grown away from his

20  white nationalist and these other extremist views.  In his

21  interview, the ruse interview, which I just want to make sure I

22  have the date correct, was in May of 2021, Morris admitted to

23  agents that he was a white nationalist, and in June of this

24  year -- no, that timing is incorrect.  In February of this

25  year, when agents executed the warrant, all of these firearms

1    were found in his home where there were two Nazi flags hanging,

2    a swastika, and I'm going to get the name of the other flag

3    wrong, a white sun or -- but it's essentially a black flag.

4    It's pictured in my motion, and it stems from, as I understand

5    it, a tile mosaic on a floor of a building that was important

6    to the Nazis during World War II.  And I guess I should also

7    add there was a framed picture of Hitler in the gun room.

8         And so, that does not indicate to me someone who has

9    stepped away from these extremist views.  It's one thing after

10   you've been arrested and charged with a crime to stand before a

11   court and disavow these views, but I think what is more

12   indicative is what you're doing in private, and what this

13   defendant is doing in private is storing his firearms with two

14   Nazi flags and a framed picture of Hitler.  And so, I would

15   suggest that the evidence shows that he really has not moved

16   away from these views.

17        Now, I appreciate that many of these statements are

18   old, but I think what's really concerning to me is this

19   defendant's involvement in these online communities that use

20   dehumanizing language and glorify violence, and that he was

21   doing that himself, and I fully appreciate that many people who

22   are involved in some of these online communities don't go out

23   and commit acts of mass violence.  I get that.  But I think

24   that it's fair to say that many people who do have been

25   involved in these communities.  They sort of produce conditions

1    of violence.  And I think if that was just, that was it, that

2    was one factor by itself, I don't think that would support an

3    inference of danger to the community, but I don't think we can

4    look at everything else in a vacuum.

5          So, he has made these incredibly concerning statements

6    to others, he's made incredibly concerning statements privately

7    in more of his notes, and I'll just briefly go through a few of

8    those.  This is a portion of one that is -- it's a letter to

9    law enforcement, and it reads:  Will you let your fellow

10   officers know that they are being sold down the river by their

11   corrupt masters.  Don't come to kill me, because I don't want

12   to kill you, but if you do come, you may succeed if you get

13   lucky, but don't count on luck, because it will probably be

14   hard, damned hard.  And later in that note he wrote, Here's

15   what you can expect if you push us to no other defense:

16   ambushes of SWAT Teams and the wholesale slaughter of the all

17   jackboot thugs who have murdered innocent Americans on the

18   orders of their socialist masters, targeted assassinations and

19   kidnapping of anti-Constitution judges and assassinations of

20   anti-American and anti-gun politicians.  And that is from

21   September of 2019.

22         And around the same time frame there are notes, again

23   private, that talk about bombs.  So, for example, there's a

24   note about making sure that the ammonium nitrate for an

25   ammonium nitrate bomb isn't the nonexplosive fertilizer.  You

1   have to make sure that it's the ammonium nitrate and diesel

2   fuel mixture.

3          And so, there's concerning language to other people,

4   there's concerning language in his own sort of private almost

5   journaling, and it's that in combination with significant

6   mental health issues, in combination with the possession of not

7   just firearms but with machine guns that demonstrate that he's

8   a danger to the community.

9          And so, then I go and I ask myself, okay, but are

10  there conditions that can mitigate that risk?  And so, my

11  biggest concern about whether there are conditions that can

12  mitigate that risk is that this defendant doesn't seem to

13  appear to accept authority.  So, what agents reported was that

14  when he was arrested he basically told the FBI that they were

15  kidnapping him, that the FBI had no authority over him, that

16  federal firearms laws are paper laws, and that the only reason

17  he went with them is because they had bigger sticks.

18         Now, I want to be very clear.  Mr. Morris disputes

19  saying that.  In a recent jail call what he said was, Well,

20  that's not what I said.  What I said is that all authority is

21  illegitimate.  So, if he's someone who either believes that the

22  FBI is illegitimate or all authority is illegitimate and he

23  came in and minimized something as minor as marijuana use to

24  Probation, that gives me concern that he is not going to

25  respect or comply with any conditions this Court could set.

1          The whole sort of smashing of the cell phone thing I

2     think weighs that same way for me.  You know, he says, Well, my

3     phone broke in this car accident.  Well, the car accident was

4     about eight months before he smashed his cell phone.  So, then

5     you think, okay, well, why then?  Why did he smash the cell

6     phone and throw it out then, assuming it really did break then,

7     which I can't say whether it did or didn't?  I think it

8     probably did break then.  The smashing of the cell phone and

9     throwing it away happened at the same time as throwing away two

10    computer towers.  There was other trash in there that, you

11    know, had I guess I'll call it Nazi doodles, doodles of

12    swastikas and other things like that, but, more importantly, it

13    happened not that long after he was confronted by FBI about

14    some of his rhetoric and his association with NSC-131.  It was

15    about two weeks after that.  So, it seems to me to be a half

16    truth, and that's not someone that Probation can supervise,

17    someone who's providing half truths.

18          And so, for all those reasons I don't think there are

19    any conditions or combination of conditions that can reasonably

20    protect the safety of the community.  Thank you.

21          THE COURT:  Thank you.  Attorney Keefe, before I ask

22    any questions, do you want to address any of those points

23    specifically?

24          MR. KEEFE:  Very briefly, your Honor.  First, on the

25    discovery issue, I didn't mean to intimate in any way that the

1    government wasn't complying with its discovery obligations.  My

2    office has received discovery, and we received over 1,500 pages

3    this week.  What I thought I said was I haven't had the

4    opportunity to review that at this point.  We just got a

5    discovery -- the government was great, they got a bulk of it to

6    us, so I wasn't trying to suggest that the government hadn't

7    complied or weren't even ahead of schedule on its discovery

8    disclosure.

9           THE COURT:  Thank you for that clarification.

10          MR. KEEFE:  The big picture, your Honor, we -- the

11   government is using horrible things attributed to my client

12   from the summer of 2020.  That is the bulk of their argument.

13   The notes that they read to you, the other statements that they

14   read to you were from 2020 and 2019, two years ago.  What the

15   government can't allege, and they didn't, is that Kyle has ever

16   done anything to harm anyone, that he's ever attempted to harm

17   anyone, or that he's actually taken any steps to physically

18   prepare to harm anyone, because he hasn't, and that alone,

19   those two factors in combination, should demonstrate that he's

20   not a danger to the community as he sits here in front of you

21   in July of 2022.

22          The government must demonstrate to this Court that

23   there are no conditions whatsoever.  And, again, if we're

24   focusing the argument on dangerousness, the case law states

25   that detention on dangerousness is reserved for a very small

1     group of people, and Kyle is not one of them.  They can't say

2     outside of combat that he's ever harmed anyone.  And he was a

3     combat engineer; he was involved with explosives.  The web

4     search that the government talked about was from when he was in

5     Afghanistan as a bomb technician, specifically investigating

6     road clearance for IEDs, your Honor.

7             The last time that the government can say that he

8     espoused anything that was of a white nationalist view was in

9     May of 2021, when during this ruse interview the government

10    agents spoke with him.  Notably, Kyle could have said, Hey, I'm

11    out of here, I'm not talking to you guys, but he didn't.  He

12    sat there and he talked to them.

13            The government posits that he threw away two computer

14    towers, but we don't have any evidence, physical evidence of

15    it.  I know the response is, well, if they threw them away the

16    government can't have any evidence, but if the Court wants to

17    detain him on that kind of information we need more than just

18    surveillance witnesses saying that they believed that he threw

19    away two computer towers.

20            I also want to address the timing issue again briefly.

21    The government talked about not getting its expert report until

22    the end of May, when indicting at the next available grand

23    jury.  In the government's response to Attorney Levin's motion

24    on page 3, it said that, Agents believed after field tests the

25    firearms were likely fully automatic.  ATF agents.  The

1    government did not seek a complaint at that time.  They didn't

2    seek to present that information to either the magistrate or an

3    Article III judge to seek an arrest warrant, although they had

4    ATF agents who would be able to testify that they believed,

5    based on a field tests, that the firearms were fully automatic.

6              I could keep reiterating the things I've said, and I

7    don't want to do that, your Honor, but the last thing I do want

8    to address is the authority issue that the government raised.

9    There is a telephone call recording of Kyle saying that what he

10   told the agents was, All authority is illegitimate.  First,

11   that reflects why we should with great skepticism rely upon

12   police reports when they try to quote people.  Secondly, that

13   was a metaphysical quote or a philosophical statement, not one

14   about whether this Court or agents can put him in handcuffs and

15   take away his liberty.  Kyle has spent the last several weeks

16   in a jail cell.  He's quite aware of this Court's authority.

17   He's demonstrated nothing but respect before your Honor and

18   before Judge Johnstone.  He understands very well that he is

19   subject to every last ounce of this Court's authority, and

20   whether that's he stays in jail or he gets out of jail and, if

21   he does get out of jail, whether he goes back to jail if he

22   violates any single condition.  That reality exists within him

23   as a 22-year-old who just turned 23, who spent the last several

24   weeks incarcerated.

25             So, I can answer any questions your Honor may have.

1          THE COURT:  Thank you.  So, I have a couple of

2     questions, just factual questions, and then I want to address

3     what you're actually proposing, because that's not something

4     that I received ahead of time, so I haven't had a chance to

5     review it.

6          MR. KEEFE:  Yes.

7          THE COURT:  And I think it may be Attorney Krasinski

8     can better answer this question.  When is the photograph of --

9     I'm going to call it the gun room, just because that's how you

10    referred to it in your pleadings.  I hope nobody has an

11    objection to that.  When was that photograph of the gun room

12    taken?

13         MS. KRASINSKI:  So, that photograph was taken during

14    the February 16th, 2022 search warrant.

15         THE COURT:  Okay.  Thank you.  And in that picture I

16    can't see the framed photograph of Hitler, but was that also in

17    the gun room at that time on that date?

18         MS. KRASINSKI:  Yes, your Honor.

19         THE COURT:  Okay.  Thank you.

20         MS. KRASINSKI:  Sort of the reason that agents noticed

21    it was because there was also one of the agent's business

22    cards, one of the agents that had met him in the interview a

23    few months before, right next to the picture of Hitler.  And

24    so, you know, the agent said, And my picture was -- or my

25    business card was right next to this picture of Hitler.  So,

1    yes, it was in there at that time.

2              THE COURT:  Thank you.  Okay.  I'm sorry, Attorney

3    Keefe, because these questions probably are really best

4    answered by Attorney Krasinski.  You can sit, if you'd like, or

5    you can remain standing.  It's up to you.

6              MR. KEEFE:  Sure.

7              THE COURT:  The note on his cell phone that you

8    referred to about the bomb-making materials --

9              MS. KRASINSKI:  Yup.

10             THE COURT:  -- when was that written?

11             MS. KRASINSKI:  So, that was April 27th, 2019.

12             THE COURT:  So, he was still deployed at that time?

13             MS. KRASINSKI:  That makes sense, but I don't know

14   that I have those dates.

15                            (Pause)

16             MS. KRASINSKI:  Yes, your Honor.

17             THE COURT:  Okay.  Thank you.  And, Attorney Keefe,

18   the statement that your client discussed on the jailhouse

19   recording, on the call, All authority is illegitimate, he

20   doesn't deny saying that during his arrest; is that right?

21             MR. KEEFE:  Correct.

22             THE COURT:  Okay.  That was the context.  That was

23   said to the FBI agents while he was being arrested?

24             MR. KEEFE:  If I could just have a moment, your Honor?

25             THE COURT:  Of course.  Take your time.

1          (Counsel conferred with defendant)

2          MR. KEEFE:  It's my understanding, your Honor, that it

3    was in the vehicle after his arrest as he was being brought to

4    the courthouse, and my client was not speaking specifically to

5    the FBI's authority or the Court's authority to do anything to

6    him but authority in general as to one human being's ability to

7    impose their will on another human being.  Quite obviously,

8    he's in the United States Military.  He recognizes that a

9    superior gives an order and he has to follow it.  He lived like

10   that for over three years or four years.  He recognizes quite

11   clearly that -- and he didn't resist arrest.  They told him he

12   was under arrest.  He actually offered to turn himself in that

13   day.  So, he recognized the law enforcement's authority to

14   exercise an arrest warrant on him, arrest him, bring him before

15   this court.  So, he adamantly asserts that was not in any way

16   meant to say I'm not going to abide by any rules, the

17   government has no control over me, and I can do what I want,

18   not meant in that way at all.

19         THE COURT:  Okay.  And the handgun that was recovered

20   during his arrest -- there was a handgun that was recovered

21   when he was arrested, correct?  I'm just trying to get the -- I

22   know there's been a lot of confusion about the inventory.

23         MR. KEEFE:  If Attorney Krasinski wants to address

24   that --

25         THE COURT:  Okay, Attorney Krasinski.

1          MS. KRASINSKI:  My understanding is he was arrested

2     outside.  In terms of the FBI arrest team, there weren't any

3     firearms on him at the time of the arrest.  They didn't go in

4     the house at that time.

5          THE COURT:  Okay.

6          MS. KRASINSKI:  So, my understanding is sort of how

7     this discussion about firearms and violent weapons came to

8     light was during his interview with Probation he disclosed two

9     firearms when asked about firearms and ammunition, didn't talk

10    about airsoft guns or that dagger, knife.  And then, as I

11    understand it, the Probation Office contacted his girlfriend to

12    confirm, and she took pictures of items in the house, and

13    that's how Probation was made aware of these additional items.

14         THE COURT:  Okay.  And so, the handgun that was

15    located in the defendant's nightstand -- and I know there was

16    originally some dispute as to whether he had disclosed it.  I'm

17    not getting to that, so we don't need to worry about that right

18    now.  My question really is did the defendant own that handgun

19    when the FBI first came in and confiscated the other weapons,

20    if you can answer that question?

21         MR. KEEFE:  Are you asking the government or me, your

22    Honor?

23         THE COURT:  I'm asking the government if they know.

24         MS. KRASINSKI:  What I can say is they didn't find it,

25    if he did own it.  They seized all firearms in the house that

1    they found.  The airsoft rifles they did find and leave because

2    they're not firearms.  The handgun, I can't tell you if he

3    owned it beforehand; all I can say is they didn't find it, if

4    he did.

5              THE COURT:  Okay.  Understood.

6              Attorney Keefe, do you have anything you want to add

7    to that?

8              MR. KEEFE:  Out of an abundance of caution and the

9    defense attorney in me saying that it was legally possessed at

10   that time.

11             THE COURT:  Understood.  And nobody is arguing that it

12   wasn't.  I'm just trying to get a handle on what was going on.

13             MR. KEEFE:  Understood, understood.

14             THE COURT:  And I know that, Mr. Morris, these

15   questions might seem like I'm asking about insignificant

16   things, but they've given me so much information, things I

17   would have normally asked about.  I'm just trying to tie up a

18   few loose ends.

19             THE DEFENDANT:  I understand, your Honor.

20             THE COURT:  Okay.  So, now I want to talk, Attorney

21   Keefe, about your actual proposal.  You went through it very

22   quickly at the start of the hearing.

23             MR. KEEFE:  Yes.

24             THE COURT:  Can you slow down a little bit and tell me

25   exactly what you're proposing?  And I'm going to have some

1    follow-up questions about it.

2          MR. KEEFE:  Sure.  First and foremost, electronic

3    monitoring.

4          THE COURT:  Yes.

5          MR. KEEFE:  Secondly, that his grandparents, who are

6    here today and live two miles away, be third-party custodians.

7    And on top of that, your Honor, we would obviously ask for and

8    agree to a no-firearms condition, no Internet.

9          THE COURT:  Slow down for a second.  So, the

10   no-firearms condition, is that no firearms possessed by your

11   client or anybody in the household?

12         MR. KEEFE:  By anyone in the household.  There would

13   be no firearms in the household.

14         THE COURT:  I understand he has renters.

15         MR. KEEFE:  He has, and it's my understanding that

16   none of them have firearms.

17         THE DEFENDANT:  None of them have firearms.

18         THE COURT:  Okay, go ahead.  No firearms.  What else

19   after that?

20         MR. KEEFE:  No Internet, no use of the Internet by

21   him.

22         THE COURT:  Okay.

23         MR. KEEFE:  Be subject to drug screens, as Probation

24   deems appropriate.

25         THE COURT:  Okay.

1          MR. KEEFE:  Comply with any mental health or substance

2     abuse counseling, as recommended by Probation.

3          And the only thing I would like to add to the standard

4     conditions is that that be in coordination with the Veterans

5     Justice Program Coordinator, Mr. Dearborn.

6          THE COURT:  Okay.  And my understanding is that your

7     client's currently working as a DoorDash delivery driver?  Is

8     that correct?

9          MR. KEEFE:  He had been, your Honor, yes, off and on

10    as a DoorDash driver.

11         THE COURT:  Okay.  And what would you propose he do

12    for work if he were on supervised release, electronic

13    monitoring?

14         MR. KEEFE:  We would be open to a condition that the

15    Court require him to be employed or actively seek employment.

16    He got arrested several weeks ago, so the world was kind of

17    flipped upside down, but working to maintain regular and steady

18    employment and putting his activities towards that he would

19    like to do, if given an opportunity.

20         THE COURT:  Thank you.  If you can answer, what kind

21    of services can Mr. Dearborn coordinate?  How does that work?

22    I'm just not familiar with the relationship.

23         Mr. Dearborn, if you wouldn't mind.

24         MR. DEARBORN:  I'm Chris Dearborn.  I'm the Veterans

25    Justice Program Coordinator, employee of the VA Medical Center

1    in Manchester, New Hampshire.  I would make a referral that he

2    be engaged in mental health treatment either at the Manchester

3    VA or the Vet Center, which is sort of a sister program to the

4    Manchester VA.  It's also a federal organization that provides

5    mental health treatment to veterans exclusively by licensed

6    therapists.  I think we would coordinate services either at one

7    or the other program, depending on who would have the most

8    robust treatment program for Kyle.  It could include drug and

9    alcohol counseling, counseling for depression, panic attacks

10   and ongoing psychological assessment to either rule out or

11   endorse a diagnosis of PTSD.

12          THE COURT:  What would the timeline look like for

13   that?  I mean, I know it's difficult to get services right now.

14          MR. DEARBORN:  So, I did speak with a therapist who's

15   willing to take the case at the Manchester VA.  I think, given

16   the nature of this case, we would try to fast track that as

17   much as we could.  I was in communication with the staff in the

18   Veterans Center today.  Kyle was in the process of starting the

19   treatment at the Vet Center.  It stopped when he stopped

20   answering his phone after the arrest, it appears.  I spoke with

21   staff there, who said that they would just put the referral to

22   start mental health treatment on hold, however, he was assigned

23   a therapist to do an intake at the Vet Center in Hooksett, New

24   Hampshire.

25          THE COURT:  So, in real time, though, when would he

1   likely get in for a first appointment?  Are we talking months,

2   are we talking weeks?

3           MR. DEARBORN:  Probably four to six weeks, your Honor.

4           THE COURT:  Okay.

5           MR. DEARBORN:  Best guess.

6           THE COURT:  Okay.  And if he's held, if he's being

7   detained, is there any role for Veterans Justice and the VA

8   during his detention period, if he's detained pending trial?

9           MR. DEARBORN:  Yes, your Honor.  We have a -- he had

10  an opportunity to meet our Reentry Peer Support Specialist, Mr.

11  Davis.  Mr. Davis and myself would work with him in regards to

12  make sure that all clinical and other supports were available

13  to him upon release from jail, continue to coordinate with the

14  Court and Probation to try a smooth transition out of jail.

15          One example of that is that he was not yet enrolled at

16  the Manchester VA.  He did fill out paperwork or gave us

17  information to complete paperwork so we could get him enrolled.

18  I did inquire about the status of his enrollment.  Based on a

19  quick review of his chart, given his discharge status and the

20  amount of time that he had in the military and his financial

21  standing, he should most likely be eligible for services

22  through the VA.

23          THE COURT:  Okay.  But we're not sure.

24          MR. DEARBORN:  I'm pretty sure, your Honor.  It looks

25  good.

1              THE COURT:  Okay.  Thank you.

2              Okay.  We're just going to take a quick break, just a

3      short, maybe five minutes or less, recess.

4              THE CLERK:  All rise.

5                    (Recess taken from 4:52 p.m. to 5:08 p.m.)

6              THE CLERK:  All rise for the Honorable Court.  Please

7      be seated.  Court is in session.

8              THE COURT:  Thank you, everybody.  Sorry.  I know that

9      was a little bit longer than promised.

10             I just have a couple of follow-up questions.  We're

11     trying to deal with this proposal, Attorney Keefe, that -- next

12     time send it over ahead of time, and then we can try to make

13     sure we understand where you're coming from and take a look at

14     it.

15             So, factual question, Attorney Keefe:  Was your client

16     living with his grandparents before he purchased the home?

17             MR. KEEFE:  He was not, your Honor.  He came home --

18     when he was discharged from the Army he was living in that

19     house.  I believe it belonged to his -- it belonged to other

20     members of the family, and he ended up living there when he

21     came home, and then he purchased the home.

22             THE COURT:  Okay.  And has he lived with anyone other

23     than his girlfriend and roommates since he came home from the

24     military?

25             THE DEFENDANT:  Yes.  When I originally had moved back

1    my mother was living in the home, and I lived with my mother at

2    the time and also my ex.  We were, all three, living together.

3              THE COURT:  How long were you living with your mother?

4              THE DEFENDANT:  Basically up until I purchased the

5    house.

6              THE COURT:  And can you remind me when that was?  I

7    don't have a note.

8              THE DEFENDANT:  I purchased the house in September

9    2020, your Honor.

10              THE COURT:  Thank you.  Okay.  Thank you.  You can be

11   seated.

12              Attorney Keefe, so explain to me how the third-party

13   custodian would work if the grandparents are living in a

14   different house.

15              MR. KEEFE:  Your Honor, and I did this in another case

16   where my client lived up north, they have the ability, because

17   they live so close, to check in, stop in whenever they want.

18   They have the ability to see and speak to him whenever they

19   want, especially if he's on electronic monitoring.  And I would

20   say that it is the threat from this Court that his grandparents

21   would be in trouble with this Court were he to violate.  It's

22   kind of the biggest stick in that regard.  He loves his

23   grandparents very much.  He wouldn't do anything to jeopardize

24   them, their security or anything like that.  But they would

25   have the ability to monitor him, either check in several times

1    a day with him, or ensure that he come to their house to check

2    in with him, or formulate any condition the Court would want in

3    that regard, or place any, I don't want to say liability, but

4    responsibility on them.

5           THE COURT:  Okay.  Oh, and with respect to electronic

6    monitoring are you talking about curfew, home detention, home

7    incarceration?

8           MR. KEEFE:  Well, we want him to work.  So, first, we

9    have no objection to a curfew and then a curfew combined with

10   GPS electronic monitoring, which would allow him to work in the

11   community and live.  But we have no objection to a curfew to

12   ensure the Court and Probation that he's home for, you know,

13   fixed hours every night, but also if he is going to be on

14   electronic monitoring I think it's in his best interests and

15   the Court's best interests that he is working.

16          THE COURT:  Okay.  So, you are asking for a curfew.  I

17   mean, those are the only choices.

18          MR. KEEFE:  Yes.

19          THE COURT:  You either get a curfew or you get home

20   detention or home incarceration.

21          MR. KEEFE:  Then curfew, yes.

22          THE COURT:  But you are not open to home detention or

23   home incarceration?

24          MR. KEEFE:  My client, as a secondary choice, if the

25   Court's not willing to do the curfew with general GPS, he would

1    be open to home detention at that point.  The incarceration

2    with his mental health issues are exacerbating those, so he

3    would be open to, as a secondary option, from a curfew to home

4    detention.

5              THE COURT:  Okay.  But not home incarceration?

6              MR. KEEFE:  I'm never really clear on what the

7    difference is between the two.

8              THE COURT:  So, for one of them he can leave; for the

9    other he's not allowed to leave his house, except for medical

10   appointments, I think medical and legal appointments.  We'll

11   hear from Probation about this.

12             THE PROBATION OFFICER:  So, detention, your Honor,

13   they can go to employment, they can go to counseling, they can

14   go to court appearances.  Home incarceration is essentially

15   they're more of a lockdown, and they can only leave the

16   residence for court appearances, see their attorney, but

17   essentially that's it, your Honor.

18             THE COURT:  Thank you.

19             MR. KEEFE:  And if the Court's not willing to do home

20   detention, I think my client would avail himself of home

21   incarceration.

22             THE COURT:  Okay.  Thank you.  I'm going to hear from

23   Probation right now about your proposal and any thoughts or

24   concerns they might have.

25             And then, Attorney Krasinski, I'm going to give you an

1       opportunity to talk as well.

2              MS. KRASINSKI:  Thank you, your Honor.

3              THE PROBATION OFFICER:  Thank you, your Honor.  So,

4       unfortunately, we didn't receive defense's new release plan.

5       We were under the impression that the defendant wanted to go to

6       the previous release plan of his residence and not have

7       third-party custodian.  So, due to the new release plan, we

8       need to do some further investigation, such as we will need to

9       run the grandparents' record?  We need to get their full names,

10      date of birth.  We also need to make sure, if the defendant is

11      going to be going to their residence, that there's no dangerous

12      weapons or firearms there.  Also, we need to make sure that the

13      defendant's residence is appropriate for cell coverage due to

14      the fact that defense is proposing electronic monitoring; and,

15      most importantly, that all the defendant's firearms and

16      dangerous weapons are removed from his residence, and we will

17      need written verification as well when that is done, your

18      Honor.

19             THE COURT:  Okay.  Thank you.

20             THE PROBATION OFFICER:  Thank you.

21             THE COURT:  And you think that might take into mid

22      next week?

23             THE PROBATION OFFICER:  Your Honor, yes.  I think

24      definitely a full day, for Monday, because we will need to go

25      to the residence, make sure, again, that there is appropriate

1    cell coverage, so at least a full day on Monday, and we could

2    be ready by Tuesday afternoon, your Honor.

3              THE COURT:  Okay.  Thank you.

4              THE PROBATION OFFICER:  Thank you.

5              THE COURT:  And, Mr. Morris, I just want to be very

6    clear about something, just because I don't want there to be

7    any confusion.  I'm obligated under the law to investigate all

8    of the alternatives to detention, so that's what we're doing.

9    I don't want you to think that I've prejudged whether I think

10   home confinement or electronic monitoring is a good idea or a

11   bad idea.  At this point we're just trying to figure out what

12   it would mean, and I'm trying to hear the evidence.  So, I

13   don't want to get your hopes up, and I don't want to dash your

14   hopes.  This is just a neutral process that I'm trying to

15   figure out what is being proposed and how it might work.  Okay?

16             THE DEFENDANT:  I understand, your Honor.

17             THE COURT:  Okay.  Attorney Krasinski, would you like

18   to be heard?

19             MS. KRASINSKI:  So, I think, just as an initial

20   matter, it seems unclear to me whether one of the firearms were

21   the defendant's or his girlfriend's in the home.  Regardless, I

22   think it would need to be clear if he were released that there

23   could be no firearms in the home.  And we talked about him, and

24   we talked about his roommates, but I just want to be clear that

25   would include his girlfriend when she's there and when she's

1     staying over.

2            I mean, I think a no-Internet condition is incredibly

3     difficult to enforce.  He can turn over his cell phone, but

4     what stops him from using his girlfriend's cell phone, from

5     using a roommate's phone, from using someone else's laptop?  I

6     think those conditions are incredibly difficult to enforce, and

7     so that's not a condition that, for me, gives me any assurance

8     that he is, you know, not going to pose a risk of danger to the

9     community.

10            I hope wherever this process goes that he gets mental

11    health treatment.  I think that is incredibly important, so if

12    he is released or at the appropriate point throughout this he

13    needs mental health treatment, and I think that's important.

14            I do have concerns about the residence, I mean, given

15    that he rents out two of his rooms.  We know who the roommates

16    are now.  I think, if the Court were to release him, there

17    would have to be very strict conditions about new renters.

18    I've not had a situation like that, but something like, you

19    know, Probation would have to approve someone else who moved

20    in.  The problem for me essentially, though, comes down to,

21    especially if he is not on home incarceration -- I mean,

22    electronic monitoring can tell us if he's in the home or he's

23    not in the home; it cannot tell us what he is doing.  And if he

24    is -- Probation can do their best to try to say, Well, were you

25    at work, were you out looking for a job, and they can -- I

1    think Probation does a great job, but they can only obtain so

2    much information, and electronic monitoring doesn't tell us

3    what he is doing when he's out in the community.

4         And so, for me, it just doesn't give me that

5    assurance.  I mean, the closest proposal for me that would -- I

6    don't think it gets there, but I think it's the closest, would

7    be home incarceration, particularly because we don't know who's

8    coming in and out of the residence.  The FBI reported that one

9    of the roommates sort of gave a "Heil Hitler" salute as they

10   were leaving, and so that gives me concerns about what's

11   happening in that residence.

12        Ultimately, though, I think, if the Court is inclined

13   to release him, I just think there needs to be incredibly

14   strict conditions about the residence.  In fact, I would rather

15   he live with someone who would be a third-party custodian, but

16   I don't think there's been a proposal for a residence that

17   Probation could verify.

18        Just, for me, given the confluence of factors of this

19   case, the danger is almost palpable, given the combination of

20   the guns and the mental health and sort of this white

21   nationalist belief, coupled with sort of this towing the line

22   with Probation, you know, saying things and clarifying, and I

23   just don't see a proposal that ultimately can protect the

24   community.

25        THE COURT:  Thank you.  One question.  You mentioned

1   mental health services, and I agree.  Could you describe the

2   mental health services or what kind of program is available at

3   Strafford County, if he stays in detention?

4          THE PROBATION OFFICER:  Yes, your Honor.  In regards

5   to services, they have the Therapeutic Community Program, also

6   known as the TC Program.  It's a three-month substance abuse

7   program.  It's not only focused on substance abuse issues, it's

8   also focused on behavioral, cognitive behavioral, thinking

9   errors and whatnot.  Also, they provide anger management,

10  parenting classes, life skills, GED.  What else?  12-step, drug

11  and alcohol education and -- I think I named them all, your

12  Honor.

13         THE COURT:  Thank you.

14         THE PROBATION OFFICER:  Thank you.

15         THE COURT:  And just going back to Attorney

16  Krasinski's point, Attorney Keefe, you're not proposing any

17  other confinement location or electronic monitoring location?

18         MR. KEEFE:  At this point, your Honor, if the Court is

19  uncomfortable with Kyle living at his own house, he would be

20  able, as I understand it, to live with his grandparents, who

21  live two miles away, who would be the third-party custodians.

22         THE COURT:  Okay.

23         MR. KEEFE:  And I understand all the -- the homework

24  Probation would need to do in that situation, as the probation

25  officer described previously.  And we would make -- the family

1    would make themselves completely available and open their home

2    to all investigation that Probation would need to do in that

3    regard.

4            THE COURT:  Okay.  Thank you.

5            Sorry.  Attorney Krasinski, do you have something?

6            MS. KRASINSKI:  No.  I was just going to say to

7    Attorney Keefe I wonder, depending on what the Court does

8    today, if the Court is going to ask Probation to take time to

9    investigate these things, I wonder if it's also worth making a

10   recommendation for TC, so whatever the Court decides,

11   understanding the Court hasn't made a decision, that if he is

12   ultimately detained he's already on that list.

13           THE COURT:  Yes.

14           MS. KRASINSKI:  It was just a thought.

15           THE COURT:  I appreciate that.  Yes.  If he's going to

16   stay in detention, I am definitely going to make a

17   recommendation for TC, which is the Therapeutic Community

18   Program that was just described.  And so, I just make that

19   recommendation now, that he should be participating in the

20   Therapeutic Community Program, and we should get him on that

21   list as soon as we can.

22           I know that you are probably anxious to find out

23   what's going to happen, and, unfortunately, we're not going to

24   be able to figure that out today, because we didn't know about

25   this plan -- originally we were faced with the choice between

1    just setting you free on your own recognizance or keeping you

2    detained.  This is a very different plan, and, as I said, I

3    have a legal obligation to consider every alternative, and so

4    we want to make sure that we do that appropriately.  And so,

5    it's going to take a little time for Probation to figure out

6    what these options are and what they would mean and then

7    explain that to me so I understand.

8           So, what we're going to have to do today is we're

9    going to have to deal with a little uncertainty for a little

10   bit longer, and what I'll do is we'll get that information, and

11   we'll call you back in for another hearing.  It won't be as

12   long as this, because we've covered most everything, but I want

13   to give everybody an opportunity to look at what we find out

14   and what options might be available and whether they'll work,

15   and I can't say that strongly enough.  I don't want everyone to

16   take this as a suggestion that that's what's going to happen.

17   I don't know what's going to happen yet, and so we just need to

18   get all of the facts in front of us before a decision can be

19   made.  I hope you understand that.

20          THE DEFENDANT:  I understand, your Honor.

21          THE COURT:  Okay.  So, is there anything further from

22   anybody before we close up for the day?

23          MS. KRASINSKI:  Not directly, other than if the

24   Court's continuing the matter, I just wanted to let the Court

25   know that beginning early next week I'll be on extended leave

1    for a few months, and so my colleague Cam Le will be handling

2    this matter while I'm on leave.  I'll do my best to fill her in

3    on everything that happened today, but, you know, it won't be

4    me that is here before you, your Honor.

5          THE COURT:  Well, I'm sorry to hear that, but I'm

6    happy that you're taking extended leave.

7          MS. KRASINSKI:  Thank you.

8          THE COURT:  So, good luck to you.

9          Yeah, go ahead.

10         MR. KEEFE:  Nothing further, your Honor.  I just

11   wanted to put that on the record.

12         THE COURT:  Okay.  Thank you very much.  So, yes, we

13   are going to close up for the day.  We will come back with a

14   new AUSA helping us out.  She's already filed an appearance, I

15   saw that come through, so I know that she will have access to

16   everything, and we'll get the information we need, and we'll

17   come back and have another discussion.  Okay?  All right.

18         Thank you, everybody, for coming in.

19         MR. KEEFE:  Thank you, your Honor.

20         THE CLERK:  All rise.

21   (WHEREUPON, the proceedings adjourned at 5:26 p.m.)

22

23

24

25

1                          C E R T I F I C A T E

2

3

4           I, Brenda K. Hancock, RMR, CRR and Official Court

5   Reporter of the United States District Court, do hereby certify

6   that the foregoing transcript constitutes, to the best of my

7   skill and ability, a true and accurate transcription of the

8   within proceedings.

9

10

11

12

13   Date: ___7/15/22            /s/ Brenda K. Hancock
                                 Brenda K. Hancock, RMR, CRR
14                               Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25