UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

United States of America

    v.                                  Criminal No. 22-cr-068-SE

Kyle Morris

ORDER OF DETENTION PENDING TRIAL

    Kyle Morris filed a motion pursuant to 18 U.S.C. § 3145(b) seeking revocation of a pretrial detention order issued by Magistrate Judge Andrea K. Johnstone on June 21, 2022. Doc. nos. 10 (detention order), 11 (defendant's motion). On July 8 and July 18, the court heard evidence and argument on the motion and made a determination de novo in light of the entire record that the magistrate judge correctly determined that the defendant must be detained. See 18 U.S.C. §§ 3142(e)-(g), 3145(b); United States v. Tortora, 922 F.2d 880, 883 n.4 (1st Cir. 1990). The court denied the defendant's motion and issued its detention order orally from the bench. This written order incorporates by reference those findings and rulings. See 18 U.S.C. § 3142(i)(1).

    When resolving a motion to revoke a detention order, the court must determine whether any condition or combination of conditions set forth in § 3142(c) will reasonably assure the appearance of the defendant ("risk of flight") and the safety of

any other person and the community ("dangerousness"). 18 U.S.C. § 3142(f). In making this determination, the court must consider: (1) the nature and circumstances of the offense charged, including whether the offense involves a firearm; (2) the weight of the evidence as to guilt; (3) the history and characteristics of the accused, including the person's character, physical and mental condition, family ties, criminal and drug or alcohol abuse history, and past conduct; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release. See 18 U.S.C. § 3142(g). If the court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, [the court] shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

During the course of a hearing conducted pursuant to 18 U.S.C. §§ 3142 and 3145(b), the government has the burden of persuading the court that no condition or combination of conditions will reasonably assure (1) the defendant's presence at trial, or (2) the safety of any other person and the community. United States v. Iglesias-Benitez, No. 92-1837, 1992 WL 210612, at *2 (1st Cir. Sept. 1, 1992) (per curiam) (citing United States v. Palmer-Contreras, 835 F.2d 15, 17 (1st Cir. 1987) (per curiam)); see also 18 U.S.C. § 3142(e)(1). The

government is required to prove risk of flight by a preponderance of the evidence and dangerousness by clear and convincing evidence. Iglesias-Benitez, 1992 WL 210612, at *2 (citing United States v. Patriarca, 948 F.2d 789, 792-93 (1st Cir. 1991)); see also 18 U.S.C. § 3142(f).

### Findings and Rulings

The government seeks detention pursuant to 18 U.S.C. § 3142(f)(1)(E), and the court determines that § 3142(f)(1)(E) applies to this case. See United States v. Lobos-Ruiz, No. 21-1800, 2021 WL 5322350, at *1 (1st Cir. Nov. 15, 2021). In briefings and at the hearings, the government argued that the defendant's release posed a risk of danger. After weighing the evidence and balancing the factors laid out in 18 U.S.C. § 3142(g), the court finds that the government met its burden of proving by clear and convincing evidence that the defendant presents a danger to the community.

A. The Nature and Circumstance of the Offense Charged and the Weight of the Evidence

The indictment alleges that the defendant possessed two machineguns in violation of 18 U.S.C. § 922(o). The defendant does not appear to dispute that he possessed the firearms at issue, but he suggested at his detention hearing before the

3

magistrate judge that they are not "machineguns" as defined by the law. The government has secured an opinion from an FBI firearms expert concluding that the weapons are "machineguns." The defendant offered no evidence at the hearing to substantiate his prior assertion, though the court acknowledges the early stage of the proceedings.

B. <u>The Defendant's History and Characteristics</u>

The defendant has no criminal history and a positive military service record. However, he admits that in 2020 he associated with white supremacist and militia groups and wrote public and private messages about starting a race war, executing people, manufacturing and selling machineguns, and orchestrating coordinated attacks that would include bombing the Massachusetts State House. Also in 2020, the FBI received a report that the New England Minutemen, a militia group, removed the defendant from their group because they were concerned that he might perpetrate a mass shooting. Subsequently, he associated with National Socialist Club 131, a neo-Nazi organization.

The defendant argues that these personal notes and online comments from 2020 are too old to support detention and that he "matured and grew away from these beliefs" during the past two years. That argument is unpersuasive. Other than counsel's assertion, there is no support for the contention that the

4

defendant has renounced these violent beliefs. Instead, the government presented evidence to the contrary. On February 16, 2022, FBI agents executed a search warrant at the defendant's home. They seized more than 20 firearms, including the alleged machineguns, from a room that the defendant described as his "gun room." The defendant was the only person with access to the room. The gun room contained the firearms mounted on the wall, two Nazi flags, a framed picture of Adolph Hitler, and the business card of an FBI agent who had interviewed the defendant. Thus, as recently as four months prior to his arrest, the defendant still demonstrated a private affiliation with and associated together white supremacy, violence, and disdain for government.

   The defendant's statements after his arrest also undermine his contention that he poses no danger to the community. The government contends that the defendant told law enforcement during his arrest that federal firearms laws are just "paper laws" and that the FBI had no authority over him. The defendant denies making those statements. In a recorded jailhouse call, however, the defendant admitted that he told the FBI, "All authority is illegitimate." While his counsel argued that this was a "metaphysical quote or philosophical statement," it wholly undercuts the defendant's claimed willingness to comply with any

condition or combination of conditions the court might impose on pretrial release.

The defendant argues that his roots in his community and his close relationship with his family should weigh heavily in favor of his release. The defendant is fortunate to have a supportive immediate and extended family, including his mother and grandparents who were willing to serve as third-party custodians if the court released him with electronic monitoring. Typically, this would weigh in favor of release, but the defendant was living with his mother when he made numerous violent, racist online posts. His personal notes explained that his sister's efforts to de-radicalize him only further entrenched his views. His family has not been a stabilizing force.

In addition, just prior to his arrest, the defendant sought mental health services with the assistance of a veteran's organization. His preliminary diagnosis includes depression, panic disorder, and post-traumatic stress disorder. He reported that he can be perseverative and angry and has worrisome thoughts about politics and possesses a sense of a shortened future. While the court believes that he would be better served by the mental health services available in the community than those offered during pretrial detention, the defendant's mental

health status increases the danger that he poses to the community were he to be released.

Finally, the defendant has repeatedly demonstrated a willingness to conceal and deceive. First, he applied for a position with the Department of Homeland Security in Federal Protective Services in 2021 to work security in a federal building. Because the FBI was already monitoring him, the FBI and Homeland Security set up a ruse interview. During the interview, the defendant repeatedly lied to the FBI until confronted with contradictory evidence.

Second, when he was interviewed for his Pretrial Services Report after his arrest, the defendant told the probation officer that he had used marijuana five or six times since returning from overseas service. During the July 8 hearing, the defendant agreed that he "smoked a lot of marijuana after [he was] discharged from the Army." He has a preliminary mental health diagnosis of alcohol and marijuana use disorder that is now in remission. The defendant was not honest with the probation officer.

Third, at the July 8 hearing, the defendant originally requested electronic monitoring at his own residence. His attorney represented to the court that the defendant's three paying roommates were known and none of them had criminal histories. However, prior to that hearing, the defendant was

aware that one of his roommates planned to move out and that a former roommate, who is a felon, planned to move in. Recorded jailhouse calls between the defendant and his girlfriend contain conversations about the rent the defendant planned to charge him, the former roommate's felon status, and a concern about whether the court would use that fact against the defendant. The defendant has proven untrustworthy. Pretrial release requires candor.

    C. <u>The Nature and Seriousness of the Danger Posed to the Community by the Defendant's Release</u>

The defendant has advocated for bombing mosques, synagogues, and diversity centers, and for starting a race war. He has developed a plan to bomb the Massachusetts State House. He wanted to "mag dump a crowd of Black Lives Matter protesters, especially the darker ones." He was a combat engineer involved with explosives and has war experience, including a three-day military attack. The seriousness of the danger posed to the community by the defendant's release cannot be overstated.

## Conclusion

The court finds that the government met its burden of proving that the defendant's release, even on strict conditions, presents too great a risk of danger. In short, there are no

conditions or combination of conditions of release that will reasonably assure the safety of any other person and the community. See 18 U.S.C. § 3142(f). Accordingly, the court denies the defendant's motion to revoke the detention order and orders that the defendant be detained pending trial.

The defendant is committed to the custody of the Attorney General or his designated representative for confinement in a correctional facility, to be held separately, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. Id. § 3142(i)(2). The defendant shall be afforded a reasonable opportunity for private consultation with defense counsel. Id. § 3142(i)(3). On order of a court of the United States or on request of an attorney for the government, the person in charge of the correctional facility in which the defendant is confined shall deliver the defendant to the United States Marshal for the purpose of appearing in connection with court proceedings. Id. § 3142(i)(4).

SO ORDERED.

_____
Samantha D. Elliott
United States District Judge

Date: July 25, 2022
cc:  Counsel of Record
     U.S. Probation
     U.S. Marshal