UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 22-cr-68-SE |
| | ) | |
| KYLE MORRIS, | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S SENTENCING RESPONSE AND
## OBJECTION TO MOTION FOR DOWNWARD VARIANCE

The defendant advocated for a race war and bombing mosques and synagogues.  He wanted to destroy the Massachusetts State House as the culmination of a series of attacks in New England.  This was too extreme for a militia group, so the defendant was kicked out and subsequently joined a neo-Nazi organization.  He gathered over 20 firearms, including the two machine guns at issue here.[1]  Those weapons were in a locked gun room containing, among other things, a framed picture of Adolf Hitler and other Nazi memorabilia.  And even after his arrest he sought to deceive law enforcement, Probation, and this Court.  Accordingly, and for the following reasons, the Government requests the Court impose a bottom-of-the-Guidelines sentence of 18 months' imprisonment, three years of supervised release, and a fine of $7,500.[2]

I.      **Factual Background**

In July 2020, a confidential informant reported that the defendant was kicked out of a

---

[1] The defendant's memorandum incorrectly states the Government also charged him in early 2021 with multiple counts of sending threatening communications.  [Def. Memo at 2]  This appears to be an inadvertent reference to *United States v. Ryder Winegar*, No. 21-cr-21-SM.

[2] This is at the bottom of the Guidelines fine range.  PSR ¶ 68.  The defendant appears to have a positive net worth of approximately $140,000 and a net positive cash flow of approximately $1,000 per month.  PSR ¶¶ 55-57.

New England-based militia group for violent rhetoric.  PSR ¶ 9.  This Court aptly summarized the defendant's language in its detention order:

> The defendant has advocated for bombing mosques, synagogues, and diversity centers, and for starting a race war.  He has developed a plan to bomb the Massachusetts State House.[3]  He wanted to "mag dump a crowd of Black Lives Matter protesters, especially the darker ones."

[ECF No. 20 ("Order") at 8]  The defendant also expressed a desire to harm businesses that hire non-whites.  The defendant used other violent rhetoric under the username "Coil" on the application Telegram.  PSR ¶ 9.

The militia group which removed the defendant from the organization feared he would perpetrate a mass shooting.  Order at 4.  After being kicked out, the defendant "associated with National Socialist Club 131, a neo-Nazi organization."  *Id.*

In March 2021, the defendant applied for a job with the Department of Homeland Security.  PSR ¶ 10.  As part of this job, the defendant would provide security for federal buildings—including federal employees and visitors from every walk of life.  PSR ¶ 10.  The FBI used the application process as an opportunity to interview the defendant.  PSR ¶ 10.  During the interview, the defendant "repeatedly lied" to federal agents before being confronted with contradictory evidence.  Order at 7.  He eventually admitted to being a white nationalist and that he was "Coil."  PSR ¶ 10.

A few months later, the FBI found a smashed cell phone in the defendant's trash.  PSR ¶ 11.  Law enforcement was able to recover data from the phone indicating the defendant had searched for and accessed instructions on how to convert firearms into machine guns.  PSR ¶ 11.

---

[3] This would have been the culmination of a series of "lo[n]e wolf attacks" including a mass shooting in Lawrence, Massachusetts, where perpetrators would "shoot[] everything that moves and take a building."  [ECF No. 8 at 5]  The defendant called this prospective attack as "one big one" which would involve someone driving a truck bomb into the Massachusetts state house, similar to the Oklahoma City bombing.  [*Id.*]

For example, the defendant downloaded a document titled "AK47 Full Auto Conversion for Dummies."  PSR ¶ 11.

On February 16, 2022, law enforcement executed a search warrant of the defendant's person, home, and car.  PSR ¶ 13.  During the search, agents located a locked gun room containing more than 20 firearms, Order at 5, including two machine guns, PSR ¶¶ 13-14. Agents also found various Nazi memorabilia, including a Nazi uniform, PSR ¶ 13, two Nazi flags, and a framed picture of Adolf Hitler, Order at 5.  The defendant was the only person who had access to this locked room.  PSR ¶ 13.

During a recorded jailhouse call, the defendant admitted to telling the FBI that "All authority is illegitimate."  Order at 5.  When interviewed for a Pretrial Services Report in this case, the defendant tried deceiving Probation by understating the extent of his marijuana abuse. Order at 7.  The defendant also misrepresented his prospective living arrangements to the Court. Order at 7-8.

## II.    Guidelines Calculation

The parties agree with Probation's calculated sentencing range of 18-24 months based off a total offense level of 15 and Criminal History Category of I.  PSR ¶ 60.  In reaching this conclusion, Probation applied a base offense level of 18 because the defendant possessed machine guns.  PSR ¶ 19.

## III.   Argument

The sentencing statute, 18 U.S.C. § 3553, sets forth the factors district courts must consider in imposing a just sentence.  Those factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," the need to "promote respect for the law," and the need to "protect the public from further crimes of the defendant."  18 U.S.C.

§ 3553(a)(1) & (2).

### A.     Nature of the Offense and Characteristics of the Defendant

The nature of the offense is relatively straightforward: the defendant possessed two machine guns.  The circumstances of the offense though are part and parcel with the defendant's history and characteristics.  As summarized above, he collected the machine guns while espousing a desire to inflict carnage on non-whites and non-Christians.  Time and again society has seen the tragic consequences when mass firepower is used to enact hateful ideology. Tragedies like the 2015 Charleston church shooting and 2022 Buffalo supermarket shooting continue to haunt the national psyche.  The seriousness of the defendant's offense cannot be overstated and suggests a Guidelines sentence is appropriate.

The defendant's variance arguments can be grouped into four overarching categories.

First, he asserts that he has since "denounced the disgusting, offensive, and violent language" he previously used.  [Def. Memo at 3]   However, the record shows the defendant is an avowed white nationalist.  Despite any public claims of de-radicalization, in private the defendant repeatedly advocated for killing racial minorities and bombing places of worship.  He displayed an affinity for one of the most odious mass murderers in human history.  He discussed having some extremists "go on lo[n]e wolf attacks" while others "raise hell in Lawrence shooting everything that moves."  [ECF No. 8 at 5]  This would culminate in "one big attack," namely driving a vehicle ladled with explosives into the Massachusetts state capitol.  *Id.*  The defendant claims he never intended to harm anyone, [Def. Memo at 3], but planning the destruction of a government building belies that claim.  Order at 4.  There is no evidence that the defendant has truly renounced his extreme views other than his own word.  In fact, as the Court previously noted, the defendant's private notes indicated that prior efforts by his sister—who the defendant

himself claims to have a strong relationship with, [Def. Memo at 9]—"to de-radicalize him only

further entrenched his views."  Order at 6.

Second, he emphasizes his prior military service and appears to suggest he has PTSD

from a tour of duty.  [Def. Memo at 7-8, 18]  The Government appreciates that the defendant

served his country and had a positive military service record.  However, the defendant's service

is outweighed by his own words and actions since leaving the army.  He has become an

anathema to the many veterans who fought and died for this country precisely so that the world

would be free from the very ideology he advocates for.  Moreover, the defendant did not claim to

have PTSD until around the time of his arrest in this case.  Neither the VA nor any other medical

provider has formally diagnosed him; the PSR only states the defendant "believes he suffers

from anxiety, depression, and [PTSD]."[4]  PSR ¶ 45.  And even if the defendant has PTSD, there

is no evidence in the record indicating the PTSD caused him to commit the instant offense.  *See*

*United States v. Demma*, 948 F.3d 722, 730 (6th Cir. 2020) (vacating downward variant sentence

where defendant failed to link purported PTSD to crime of conviction).

Third, the defendant represents that he had a difficult childhood, losing his father at a

young age and having a mother who suffers from bipolar disorder.  [Def. Memo at 8-9, 17]  For

example, he states that he "stopped speaking to his mother altogether several years ago" and that

she "once told him she hoped he would die."  [*Id.* at 8]  But this did not prevent him from relying

on her when seeking release during the detention hearing.  Order at 6 (noting "his mother and

grandparents . . . were willing to serve as third-party custodians if the court released him").

And fourth, the defendant emphasizes that he does not have any criminal history and that

---

[4] In a similar vein, the defendant claimed to have suffered a traumatic brain injury twice in recent years. [Def. Memo at 10]  However, there appears to be no long-term consequences other than periodic nausea.  PSR ¶ 44.

he needs rehabilitative services.  [Def. Memo at 12-16]  The Government agrees that the

defendant does not have any prior convictions.  But that fact alone does not warrant a downward

variance.  The relevant policy statement dictates that "a departure below the lower limit of the

Guidelines range for Criminal History Category I on the basis of the adequacy of criminal

history <u>cannot be appropriate</u>."  *United States v. Sherpa*, 265 F.3d 144, 149 (2d Cir. 2001)

(emphasis added) (quoting U.S.S.G. § 4A1.3(b)(2)).  Construing an analogous directive from an

older version of the Guidelines, the Supreme Court held that a district court abused its discretion

in considering a defendant's low risk of recidivism based on criminal history.  *Koon v. United

States*, 518 U.S. 81, 111 (1996).  In doing so, the Court explained "[t]he Commission took that

factor into account in formulating the criminal history category."  *Id.*[5]  Put simply, there is

nothing unusual or exceptional about the defendant's lack of criminal history that is not already

accounted for in the Guideline calculation.  At most, the defendant's record supports a sentence

at the bottom of the Guidelines range.

     In short, as the Court noted in its detention order, the defendant has some positive

attributes.  Order at 4.  He served his country and has a loving and supporting family.  However,

these were not "stabilizing force[s]."  *Id.* at 6.  And they are vastly outweighed by the

defendant's own words and deeds.

### B.     The Need to Promote Respect for the Law and Ensure Public Safety

     Unfortunately, despite his prior military service, the defendant has become a danger to

the public he once swore to protect.  White nationalists and extremists have emerged as one of

the most potent threats to the security of this country.  The Court noted in its detention order that

---

[5] *See also United States v. Valverde-Solano*, 299 F. App'x 21, 24-25 (2d Cir. 2008) (affirming
sentencing court's denial of downward variance where defendant argued his "Criminal History Category I is
still 'greater than necessary' under § 3553(a)" where district court found that "the advisory sentencing range is
. . . appropriate to meet the requirements of the statute.").

"[t]he seriousness of the danger posed to the community by the defendant's release cannot be overstated." Order at 8. The same holds true today. The defendant's actions—including developing a plan to bomb the Massachusetts State House—cannot be chalked up to PTSD or a poor childhood.

Moreover, the defendant has exhibited a pattern of contempt for law enforcement and judicial system. After his arrest, the defendant was recorded expressing his belief that "All authority is illegitimate."[6] Order at 5. The Court also noted a raft of other lies the defendant has made during this case: (1) he lied to the FBI about his white supremacist beliefs until confronted with contradictory evidence; (2) he lied to Probation concerning his marijuana use; and (3) he lied to the Court about his housing situation. *Id.* at 7-8. He was even recorded speculating how the Court might "use that fact against [him]." *Id.* at 8. He "has proven untrustworthy." *Id.*

Finally, the recommended sentence would promote respect for the law and general deterrence. White supremacy has unfortunately become increasingly prevalent in this country over the last decade. A sentence of time served would send a dangerous message that other extremists can flagrantly violate the law and face minimal consequences. By contrast, a sentence of 18 months' imprisonment would send a message loud and clear that the law enforcement system will not tolerate their crimes and cause them to think twice before breaking the law.

## IV.    Conclusion

For the foregoing reasons, the Government respectfully requests the Court impose a sentence of 18 months' imprisonment and a fine of $7,500. Given the defendant's history, the Government also requests the Court impose the maximum term of supervised release of three

---

[6] As the Court noted, the Government also represented the defendant told the FBI that firearms laws are "paper laws" and that the FBI had no authority over him. Order at 5.

years.

Respectfully submitted,

JANE E. YOUNG
United States Attorney

Dated: May 2, 2023          By:    /s/ Alexander S. Chen
                                   Alexander S. Chen
                                   Assistant U.S. Attorney
                                   53 Pleasant Street, 4th Floor
                                   Concord, New Hampshire 03301
                                   (603) 225-1552
                                   Alexander.chen@usdoj.gov